BROWN, Chief Judge,
concurring in part and dissenting in part.
hln April 2004, Samson received a letter from Nelda Robinson Gremillion notifying Samson of pending litigation regarding the donation to Billy Jean Smith. This was the first notice that Samson had .that the donation was being questioned. In response, Samson placed Effie Smith Con-nell’s 1/2 mineral interest that she had donated to her son, Billy Jean Smith, in suspense for all the properties (Billy Jean Smith and his sister had also ^inherited a 1/4 interest each from their father which Samson continued to pay). At the same time, in April 2004, a new well was completed in Section Eight. Revenues from that well were paid utilizing- the old pay decks. Connell’s 1/2 interest was paid in accordance with the donation to Billy Jean Smith and his two sons, Gary and Mark Smith. That situation continued for five additional wells which were drilled in Section Eight. • These six wells were in pay status ■ rather than suspense status. Experts for all parties agreed that the amount paid to the Smiths before the pay decks were corrected was $1,301,149.13 (“1.3 million”).[2]
In February 2005, Samson received an uncertified copy of judgment annulling the 1996 donation to Billy Smith. Approximately 1 1/2 years later, in July 2006, the co-administrators of the Connell succession, Mark Smith and Joe Robinson, corresponded with Samson recognizing that Billy Smith had sent Samson a certified letter requesting that all royalties be held in escrow until the succession could be com *985 pleted, and further stating, “Due to complications and delays in completion of the closing of (Connell’s) estate, we request ... that future royalties be paid to her Estate ...” Letters of administration were attached. In July 2006, Samson immediately responded and put the properties where payment had been suspended in pay status and released payment in the amount of $946,237.88 to the succession. This payment included the current month’s revenue for the six new wells. The pay decks for those six wells were changed to show Connell’s 1/2 interest being paid to the succession. The revenues paid to the Smiths for |athe six new wells drilled from the middle of 2004 to the middle of 2006 were not addressed. It is this money paid to the Smiths that is at issue in this case sub judice.
In July 2006, Nelda Robinson Gremillion e-mailed Samson that the posted, check was an underpayment and stated, “We have not determined which properties have, or have not been paid ... but we are certain that an error or omission has occurred somewhere in accounting ... or perhaps in properties transferred. Hopefully, there is a simple explanation.” Thereafter, Nelda Gremillion sent another e-mail in which she stated that the estate’s interest in wells in Section Eight was $2,119,730. Joe Robinson, co-administrator, also wrote seeking information. Curiously, there was nothing sent to Samson from .Mark Smith, the other co-administrator and recipient of the overpayment.
Due to obvious -problems among the heirs, in October 2006, Samson filed a con-cursus petition naming and citing the succession and all the individual heirs of Effie Smith Connell as claimants-defendants seeking a global resolution of royalty, accounting matters. Additionally, Samson specifically sought to “be allowed to make such adjustments as may be appropriate to account for payments previously made to the parties which, depending upon the decision of this Court, should have been properly credited to other defendants.” The concursus petition referred generally to all wells in Section Eight.
Having received no response from anyone to the concursus, in March 2007, Samson’s attorney sent a letter to the succession’s attorney noting that an answer had not been filed in the concursus and seeking a resolution to | ¿include credits for overpayment. Samson attached ar listing of all payments to the Smiths for the six wells at issue herein. Specifically, Samson stated:
The .concursus suit we filed on behalf of Samson Contour on October 11, 2006, has been pending for sometime and no one has filed an answer. In an effort to get the case moving forward, I have enclosed the list of wells and the amounts paid for production from each of these wells to Gary Carl Smith, Mark Allen. Smith and Billy Jean Smith from April 2004 through December 2006 (the list, however, shows through May 2006). I hope that this information will assist you in trying to reach .an agreement for ' the consensual sharing of production and resolution in this matter. Please also remember that some of the production which was paid to Billy Jean Smith based on donations later declared null may need to be recouped depending upon the outcome of this suit.
In any case, I believe we should get our responsive pleadings on file as soon as possible. If no resolution -can be reached, we will then at least be able to move forward with the concursus.
The response quickly came in May 2007, when the succession, through both co-administrators, Mark Smith and Joe Robinson, filed an action to cancel the leases for nonpayment of royalties.
The succession of Effie Smith Connell consists of two groups. Billy Smith’s heirs *986 would inherit one-half and his sister, Betty Smith Robinson’s heirs would inherit the other half.[3] Mark Smith and Joe Robinson were co-administrators of the Connell succession. The Smiths, including Mark Smith, were timely paid all of the $1.3 million royalties for Connell’s 1/2 interest for production from the six new wells in 2004 — 2006. Thus, the Smiths were overpaid and the Robinsons underpaid.
Warren Martindale testified as an expert for the succession. He explained that proper accounting practice to correct an overpayment was “to | ¡¡reverse and rebook and either recoup over time or ask for payment back from the owner that was overpaid.” Samson’s supervisor, John Sniveley, testified that at the time of Nelda Gremillion’s e-mail all of the revenues had been paid out either to the succession or the Smiths.
Resolving Samson’s overpayment to the Smiths
Having been overpaid, the Smiths had no cause of action against Samson for their royalties or for penalties and attorney fees. Both Samson and the succession, however, had causes of action under the concept of unjust enrichment and for an accounting from the Smiths. Even so, the trial court sua sponte enjoined Samson from pursuing any claim against any heir and then found that Samson must, by way of the succession, pay the Smiths, for a second time, them share of the royalties plus penalties and attorney fees. What the Smiths could not do, the succession did for their benefit. This is a legal absurdity.
Louisiana Civil Code art. 2299, which addresses the obligation to restore, provides that a person who has received a payment or a thing not owed to him is bound to restore it to the person from whom he received it. The 1995 Revision Comments to La. C.C. art. 2299 provide that:
(a) This provision is based on Article 2301 of the Louisiana Civil Code of 1870.
(b) Article 2301 of the Louisiana Civil Code of 1870 declares: “He who receives what is not due to him, whether he receives it through error or knowingly, obliges himself to restore it to him from whom he has unduly received it.” Louisiana courts interpreting this provision have correctly ordered persons who received things or payments not owed to return them to the persons who made the delivery or the payment. Under Article 2299, as under Article 2301 of the Louisiana Civil Code of 1870, the person who receives a thing or a payment not owed, 1 whether knowingly or through error, must restore it to the person from whom he received it.
In Matthews v. Sun Exploration and Production Co., 521 So.2d 1192, 1198 (La. App. 2d Cir.1988), this court found:
Recent jurisprudence has properly interpreted the Code Articles to provide that negligence per se by a payer is not a bar to recovery for the payment of a thing not due. (Citations omitted).
We believe the defendant’s error in overpaying Mrs. Chamberlin amounted to an ordinary or “honest” mistake as contemplated by the Civil Code Articles. Consequently, Sun’s error in making the overpayment does not bar its recovery of these funds.
The fact that the mistake was due to negligence on the part of the person who made the payment will not preclude a recovery. Negligence in paying does not give the payee the right to retain what was not his due, unless he was misled or prejudiced by the mistake. Matthews, supra.
The trial court’s decision not to allow the amendment by Samson to specify claims *987 for fraud and unjust enrichment was based upon the belief that the amendment was not related to the conduct, transaction or occurrence set forth in the original concur-sus pleading. This was clear error.
La. C.C.P. art. 1153 provides:
When the action or defense asserted in the amended petition or answer arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of filing the original pleading.
This article requires only that the amending petition’s thrust factually relate to the conduct, transaction or occurrence originally alleged. Gunter v. Planche, 439 So.2d 437 (La.1983). In Samson’s concur-sus petition, recoupment of overpayments was specifically pled. This factual allegation |7is a crucial element in Samson’s statement of the case and unquestionably is an element arising out of the conduct, transaction or occurrence attempted to be set forth in the original pleading. I concur with the new majority in reversing that part of the trial court’s judgment and remanding to allow the amendment and to conduct further proceedings after the amendment.
Samson’s Payment to The Succession
A Samson employee made a mistake in not vetting the title abstract records with other departments. Samson supervisor John Sniveley explained that this case “was a timing issue.” A new well was being set up and the divisional analysis “was budding ownership off the (current deck) while the other interest was being changed.” Samson did not act willfully or intentionally. Samson did not personally benefit from this mistake. In its March 2007 letter to the succession’s attorney, Samson set out the details of the $1.3 million and asked to resolve the matter including credits for overpayments. In response to this request, the succession filed this lawsuit to recover the royalties already paid with double penalties, interest and attorney fees.
Samson claims that it timely paid in full all the royalties at issue in this case. Samson argues that the $1.3 million payment to the Smiths is a valid payment of the very interest that the succession is administrating and is now claiming. Samson asserts that the succession representatives, including Mark Smith, who in fact received the royalty payment at issue, are bound to credit and account for payments made by Samson to the Smiths, and those heirs are bound to account to the succession | ¿representatives for payments they received. I agree.
A willful act is generally one in which the actor intended the end result. Peacock’s, Inc. v. South Central Bell, 455 So.2d 694 (La.App. 2d Cir.1984). The Louisiana Supreme Court in State v. Vinzant, 200 La. 301, 7 So.2d 917 (1942), stated that “willfullness” and “negligence” are incompatible and are direct opposites of each other. “Negligence” is characterized by the absence of intent, whereas “willfullness” is characterized by purpose or design. “Clearly, the words ‘willfully’ and ‘wantonly’ are not synonymous with the words ‘negligently’ and ‘recklessly, the former implying intention or deliberation and the latter mere carelessness or lack of due and reasonable care or disregard for the rights and safety of others.” Vinzant, 7 So.2d at 922.
Given an operator’s large volume of oil and gas production, the numerous and disparate leases under which production is carried out, the varying royalty fractions, the minute decimal interests, and the cumbersome calculation models that often dictate royalty payments, as well as the thousands of diverse payees receiving royalty payments, it is inevitable that either human or electronic error will occasionally *988 cause incorrect royalty distributions. In this case there were several changes in division orders and the pay decks. There were successions, exchange deeds, donations, deaths, and annulments. . As Mr. Sniveley said, two events crossed at the same time in two separate divisions and one did not know the other.
The failure to pay the succession was neither willful nor wanton but was negligent. Samson actually paid the royalties owed to one set of heirs, which included Mark Smith, who was a co-representative of the succession. |3The trial court’s ruling allowed the Smiths to keep the $1.3 million they received in- error and required Samson to pay an additional $1.3 million to the succession, together with another $1.3 million in penalties and $505,000 in attorney fees.
Division and transfer orders are binding upon underpaid royalty owners until revoked, but only as a general rule. In the typical case, the correct total of proceeds is paid out to royalty owners as a group and any errors made in the division orders affect only the allocation of proceeds among the royalty owners. In this situation where it is a succession rather than an individual heir claiming to be underpaid, the appropriate remedy is for - the succession’s accounting process. The succession could reverse and rebook and either recoup over time or ask for payment back from the Smiths.[4] To permit the succession as an underpaid royalty owner in such a situation to recover on behalf of the overpaid heirs from the operator would subject the payor to repayment of the royalties, double penalties, interest and legal fees. This might be different if Samson personally benefited from the erroneous division order. Samson received no benefit or advantage from this mistake.'
I would reverse the award of $1.3 million to the succession, penalties and attorney fees.

. $650,000 was paid to Billy Jean Smith and $325,000 each was paid to Mark and Gary Smith.

. Both Billy Jean Smith and Betty Smith Robinson had died.

. I find Hall v. James, 43,263 (La.App.2d Cir.06/04/08), 986 So.2d 817, to be distinguishable but if not then it is wrong.